121-1522 W.C. Asplundh Brush Control Appellant by Andrew Fernandez v. Illinois Workers' Compensation Comm'n Benjamin Smith-Appley by Kevin Morrison. Mr. Fernandez, you may proceed. Thank you. Good afternoon, judges. May it please the court. I have a Fernandez. You probably feel much better now, don't you? So do we. Thank you. Andrew Fernandez on behalf of Plaintiff Appellant. This case stems from an accident in October of 2015. The accident was undisputed. The petitioner suffered an elbow injury. It was accepted as compensable. The petitioner recovered, achieved MMI, and was released to a trial of full-duty work. And that's where the problem started. Petitioner refused to return to the trial of full-duty work and instead ran back to his doctor, asked his doctor to author restrictions by his own request. His doctor was misled to believe that he had returned to work when he had not. And permanent restrictions were given to the petitioner. So the company offered him a modified-duty return to work, work as an equipment operator, whereas the petitioner was a foreman prior to this. It was offered at the same rate of pay as he was earning before. And again, the petitioner refused to return to work. So for a second time, without ever attempting to show up, he just didn't show up. Instead, the petitioner took it upon himself to file for unemployment and found himself a new job earning less money. So the arbitration decision states that the petitioner's restrictions were due in part to the elbow injury and awarded a wage differential, TPD, and maintenance benefits. Okay, let me stop you for one second. Just for clarification, there were two claims filed by the claimant, correct? That's correct. One for the carpal tunnel, which was the second claim, and one for the elbow injury. That's correct. Okay. And in your appeal, you are not appealing anything with regard to the second claim. Is that correct? That's correct. Where in the first claim did the arbitrator or the commission award TPD benefits for the first claim? I see the TPD benefits that seem to come out of the second claim, which is not being appealed. I know that the commission consolidated for hearing, but then issued two separate decisions. They did issue two separate decisions. And if I'm not mistaken, I don't have the full record in front of me. I do believe the TPD benefits were issued in the first, this elbow injury. And if that is correct, that's great. If it's not, however, then you see that is quite troublesome for us to award anything with regard to TPD if TPD benefits were only assigned in the second claim, correct? Correct. Okay. If at any point you happen to recall or can point us to in the first claim and the decision based on the first claim, the elbow injury, where TPD was specifically awarded in that claim, please feel free to, even if it's in the middle of a different argument and Oh, I just remembered. Sure. Thank you. Sure. So our first argument is, is that the petitioner isn't doing TPD or maintenance benefits for this, this elbow claim. And it sounds as if your honors agree petitioner was, was twice offered available jobs and, and refused to show up for either of them. Didn't petitioner have an reason for doing that? Didn't he claim it was outside his restrictions with these vibratory tools or whatever he was calling them? Yes. So we'll get to that and, and the petitioner. So when he, when he ran back to the doctor, he said, look, I'm having terrible difficulty, terrible pain using vibratory tools and mowers. Now he worked for a mowing company. Did he literally run back to the doctor, Mr. Fernandez, or are you embellishing that? No, he literally, he literally did because so, so, and the record bears, how do we know that? So on November 10th, Mr. Morrison contacted me via letter asking if my client would accommodate his restrictions. On November 11th, I contacted Mr. Morrison to let him know that they would he, he went back to the doctor. Oh, he went back. Oh, that's what I was wondering because I don't know what the distance was and how long it took him to run. I just think maybe we ought to probably not characterize something. We don't have an evidence. It was a, it was a very, very, very short timeframe that, that, that he scheduled this appointment to, to increase his restrictions by his own account of returning to work and not being able to do the job. So the deposition testimony of, of the petitioner's treating physician bears this out. And I encourage your honors to look through this deposition testimony where the doctor states that he would have expected the petitioner to be able to do the wanted to try the petitioner out working full duty. And if that didn't work he believed that the petitioner should have been able to work the modified duty equipment operator position that he was offered. So basically there's no medical evidence in the file to restrict this, petitioner from returning to work as of October 24th, 2016. By November 11th, as we discussed, he was offered a restricted duty return to work as the equipment operator. He refused to show up and instead on November 15th, went back to his doctor to get increased work restrictions. Again, these restrictions were, were completely subjective. And the doctor testifies to this that he gave the petitioner, the benefit of the doubt that he couldn't use vibratory tools or equipment. Again, working for a lawn maintenance company that poses an extreme challenge for any offer of employment. Who's Dr. Pannunzio, Mr. Fernandez? Who's Dr. Pannunzio? Dr. Pannunzio is the treating physician. Didn't he give the claimant permanent work restrictions of no use of the tools or the mower? He did. He did. But that was, that was again, that was specifically at the request of the claimant who told him that he had used vibratory tools and had a numbing tingling sensation in, in the elbow and the arm. And again, this is, this is patently untrue as, as the petitioner never showed up for work. If the claimant tells the doctor something, the doctor believes him and issues it, how can you say there's something wrong with that? So, so the, the, the doctor didn't check out his store. You know, the doctor just gave him the benefit of the doubt and assuming that he used tools, assuming that he tried to return to work and couldn't, but, but that none of that's true. So do we ignore the doctor's restrictions? Yes. Yes. I would argue that, that these, these, these restrictions are based on completely untrue and exaggerated accounts of trying to return to work and failing when the petitioner never even tried to show up. Yeah. Right. If the, if the, if the doctor says you can't go back to work using vibratory tools after releasing him to full duty, because the petitioner says, doctor, I, I tried, I tried using vibratory tools and my, my arm hurts too bad. And the doctor says, okay, you know, I grant these restrictions, but in fact, the petitioner never tried. I mean, that's extremely problematic. I think it was, I think it was wrong and reversible error for the commission to rely on restrictions that were, that were authored under untrue circumstances. So you're saying that the claimant never experienced vibrational tools to have an assessment of whether they hurt them or not. That's correct. And, and by refusing to even show up and try to return to work, he foreclosed the respondent of ever putting the guy back to work. Right. They, they, the petitioner effectively took away the power from, from, from the company to put him back to work. I mean, he, he basically quit his job and then ran to the doctor, excuse me, not ran, went to the doctor a few days later to get increased restrictions that would, that he knew would forever take him out of the workplace. Okay. So, you know, from, from response, there was never an instance when he took a vibrational tool and experienced a negative effect on his body. So the, the record contains one snippet where the petitioner reports using a lawnmower at home. And what happened? According to the petitioner, he experienced numbness and tingling. But when you go, when you, when you, when you flash forward to the deposition of the treating physician, it's clear that the treating physician thought that he had returned to work using vibrating tools at work and couldn't do it. Whereas, whereas in fact, the petitioner never returned to work. Not, not once he, he, he didn't try to, to show up to do a full duty job and he didn't show up to try and do the equipment operator job. None of those would involve vibratory tools. Well, so the, the level of vibration involved as equipment operator is, is, is up for debate. The respondent offered testimony that the Barco mower that they were, that he would have been expected to use, it vibrated very little. Of course, the petitioner testified that the Barco mower vibrates incredibly strongly and, you know, has violent jerking motions, but... Having used it? Well, so, so this becomes a he said, she said, right? Because the, the respondent put on three witnesses that said in their experience, the Barco mower vibrates very little, if any, and is operated with a hydraulic joist stick. So if it's a he said, she said situation, then it boils down to who the commission believed and they assess the credibility of the witnesses, correct? Right. And, and again, and again, that's giving credence and, and credibility to his statement that he can't use vibrating power tools where the medical evidence shows that he was first offered a full duty return to work and refused to show up. Well, Mr. Fernandez, I guess what I'm saying, if somebody has a problem with this equipment, they go to their doctor, the doctor gives them a permanent restriction. You seem to be suggesting the claimant should ignore his doctor's, you know, recommendations and go back and see if he can do it. It seems to be what you're saying. No. So, so I would, the problem is he never showed up to try it after his full duty release, right? His, his doctor thought that he was completely capable of returning to work and, and, and doing his full duty job, not even a modified duty job, his full duty job, he thought he would be able to do. And then he went back and said, no, okay. Based on, based on your history, you can't do anything. Well, that, that all boils down to what you called a, a single small snippet in the, in the testimony where he suggests that, hey, I tried this at home. Correct. I can't do this job. So why make the trip back to the employer? I've tried it. So once again, it's, it's one of those things, did the commission believe him? Did the doc, you know, was, was the doctor, did the commission feel that the doctor was and so it brings us to a point of how do we, how do we overturn that on a manifest weight situation? Well, because, because the, the doctor's testimony that they relied on in, in awarding benefits, the doc, the doctor testifies that first of all, he thought he would be able to return to full duty work. And second of all, that he authored the work restrictions, believing that he had returned to work where, where, where he hadn't. So you're the, the major discrepancy that you see there is, had the doctor been aware that, that this gentleman tried to more at home and based the same, his same decision of permanency on, on the fact that he tried it at home and not at work, then it would be okay. But because he was misunderstanding or misinformed and was under the impression that the gentleman went back to work and tried the machinery, that makes the difference. Yes. Okay. Any other questions from the court? I believe so. Okay. Mr. Fernandez, you'll have time and reply. Thank you, Mr. Morrison. You may respond. Thank you. To answer the court's question, just starting off, I do have the decision in front of me. There was no TPD on either decision awarded on this claim. As far as I've seen on the, there was maintenance awarded for 17 weeks, starting 1115, which would take place after his release with permanent restrictions, the date in question that was awarded on this claim. Thank you for that. Did he, did your client receive maintenance award after he was working part-time and started working elsewhere? Yes. The way that it was structured is because he, he testified that this job that he went and found was raising in rates. It was varying, and he gave a specific date. So from 1115 of 16 to 313 of 17, he was awarded 583.75, which was full maintenance. From the dates of 314.17 to 611, he was awarded 275.75 cents maintenance. Because it was reflecting that was when, in March of that year is when he got his new job, his current job as a laser operator, which he found on his own. So typically the maintenance would be, you know, really wouldn't question the commission's decision if he was given maintenance during his job search. But once he started a new job, maintenance typically doesn't continue at that point, does it? It would be, maintenance would if, does the job doesn't earn as much as the prior position. So in that time, when he first started this job, he was making $11 an hour and working full-time. So that's how the commission awarded maintenance. By the time he actually, the time of trial, he was making $17 an hour. So they had reduced his maintenance award to reflect what his, his eventual wage differential would be, which is $107.75 an hour, or a week, excuse me. Because his new job had raised his rates up to pretty close to where he was making before, just within his restrictions. Now, going back to what the court was touching on, this gentleman had actually prior to this, his release on September 20, 2016, said still reporting difficulty with vibratory tools and difficulty mowing his lawn. That was something he had established before. He also, during this period of time until November 11, 2016, which is as noted by the commission, he was working a light duty alternative program through Goodwill, which she had stopped doing around November 11, 2016. At that point, I had reached out to opposing counsel because he had talked to his doctor stating that he was given new restrictions. Their nurse case manager was aware of this. That's when I, there's an email to that effect on that date. The, then on the 15th, it would became formal. And that was when he actually saw the physician who then again, put in those restrictions and made them permanent, adding in the carpal tunnel, which I won't bore the claim, the court with this, because that's not here. So what do you make of your opponent's argument that seems to imply that the claimant had some obligation notwithstanding the restrictions from the doctor to go back to work and try it again? I don't think he has any obligation to do that. If he doesn't want, if he's having issues and he's having issues with safety and he's worried about going back full duty. And this we've got to remember in point of fact, full duty means chainsaws, heavy machinery, things like that. He's concerned with a lawnmower. I think his worries were valid. Of course, even their physician thought he should get a safety evaluation before they see him, Dr. Merrill. I think the other thing that kind of got lost in this conversation is after November 15th, respondents just decided we're not going to honor these restrictions. We don't think they're valid. They didn't have a section 12 examination to say that they didn't have anything. They just I asked them to accommodate. And then when they accommodated the restrictions specifically say no mower, which what they offered him was specifically a Barco mower. If the doctor was of the impression that this is a lawnmower versus a giant machine that mows down trees, I think that restrictions on its face is not valid. Respondent had no justification at that point in a question of fact after Dr. Merrill saw him in March, months later, but they don't have exactly clean hands here either, Your Honor. And quite frankly, the commission, these are the exact same arguments response made to the commission and arbitrator Nowak. Arbitrator Nowak addressed them in his decision. Then the commission went further and wrote a further five pages explaining why that going through the effects of this claim, examining each of the witnesses, the two witnesses, not three, as respondents said. I don't know who the third was. And I also had a witness, Mr. Fivecoat, who worked the exact same job as a foreman with petitioner who stated that Barco mower also vibrates. The commission weighed all of these, all this evidence, and they found in favor of the petitioner. They thought he was more credible. They thought his doctor was more credible. They noted that Dr. Merrill had no idea either what the heck my guy did. So in the end, the commission, the finder of fact, decided they believe my guy. And these are all questions of fact. There's more than enough evidence in the record from Dr. Pannuzio and the record and the time and the evidence submitted at the time of trial through decision. I think under a manifest weight, there is no questions of law here. There's just questions of fact. And which side does the commission believe? And I, and I think that the court should give a lot of deference to the commission as the finder of fact on this claim. I don't think claims that my client ran off to his doctor when he was well-documented for months saying he is having problems with vibratory tools is an accurate statement. I think the petitioner in this claim was having a long-standing problems that he had documented multiple times with this physician, even in October 24, 2016, September 20th of 2016. And then on his final note, November 15, 2016, he was never inconsistent. He was met his, his grip strength, his measure at that time is 80 pounds versus 130 pounds. The 80 pounds is his dominant hand. Yes. 80 pounds is probably stronger than me as a lawyer, but I don't handle chainsaws every day. I'm not handling Barco mowers. So I think the question is the restrictions. It's not on the petitioner to go try, try something that's in direct conflict of his doctor. I think, I think that the to put a good faith effort into, into accommodating restrictions is put forth and they didn't, and they had no justification to do so. And by the time they got justification, petitioner is pretty much already found new employment that could accommodate him. He was doing what this, what this board, what the, what the work comp wanted him to do, found employment and employment where he actually may almost erase his average weekly wage down to only or his wage differential to $107. Can I, can I ask you a question council? Of course. What was the basis for the award of maintenance? It was petitioner's new job at, at the mechanical and his wages where he was making $17 an hour full time. And which was fairly close to what he was making before, but as a different profession position, and he pretty much said he was done. Is there any evidence in the record that he was engaged in some physical rehabilitation program? No, no, your honor. Was he engaged in any formal job training? Not in formal job training. No, I demanded vocational rehabilitation at the time, but they didn't allege to give it. Was he, was he in a self-directed job search? Yes, your honor. As part of his unemployment, he did do a job search and that's how he found the position. That's when he found it. But once he found the position, they awarded maintenance after he found the position, didn't they? Correct. But it was a job that it would be a job that would be, it wasn't making as much as he was before. So it could be termed as a weight maintenance or it could be termed as a further wage differential starting at that point. But his job started at $11 an hour and then eventually made it to 17. Well, I commented on it because according to the arbitrator's award, which was approved by the commission, they paid him the money apparently on a wage differential of maintenance. Correct. But if you're not engaged in a formal job training, a self-directed job search, or some physical rehabilitation program, you're not entitled to any maintenance at all. Correct. But he was at the time of his, he was at that time doing a self-directed job search. That's how he found the job. So he may have been entitled to maintenance up to that point. Right. But once he got that job, he was no longer engaged in a self-directed job search training program or physical rehabilitation program. So where's the authority for maintenance? Well, I would assume based on the tenor of the statute that if someone gets a job, say a pipe fitter job at Taco Bell that doesn't pay what a Taco Bell and they're working that up until the day of trial, they're still entitled to compensation for the different two-thirds of difference between that and their average weekly wage. It would be a wage differential, but it wouldn't be maintenance. That's for sure. And it might be, and this board would like to that is when his wage differential started and then was later modified, I would be no problem with that because it'd be the same end result. Well, who's going to have a problem? You didn't appeal it. Yeah. Correct. If the court has no further questions, I can rest now. Okay. I don't hear any. Thank you, Mr. Fernandez. You may reply. Yeah. So opposing counsel makes the same assumptions that the commission does erroneously in its opinion and assuming that the petitioner would have to use a chainsaw in his work and in assuming that it would be unsafe for him to do so. Okay. Let's stop for just a second on that. Sure. The restrictions were no vibratory tools, and I believe it was specifically not a mower or a chainsaw. Is that correct? Correct. Is the Barco device a mower? So the Barco device is, it's hard to describe this. It's like a massive, massive caterpillar type machine with tires that are as tall as I am. And behind it, it has a mowing device that folds down. Okay. So it's like a batwing mower of some sort? Correct. What's its purpose? Its purpose is to, so like highway maintenance, power line maintenance, you drive down the highway and you mow four foot wide sections at a time. Right. So the operative word there is the device is used to mow along the highways and so forth and so on. So I think that doesn't take a far stretch to suggest that the Barco device is a mower. So then if the restriction was to not, that he was restricted from operating a mower, why would he need to go in to check to see if he could operate it if this restrictions specifically preclude him from operating a mower? Regardless of the chainsaw, let's leave the chainsaw out of it. Right. So our point, Judge, is that the petitioner basically asked the doctor, he authored his own restrictions saying, I can't use vibrating tools and I can't use mowers. And meanwhile, he's employed by a brush control company where you have to use a mower, you have to use like, you know, the restrictions that he asked his doctor for take him out of any employment whatsoever. So you see where this becomes problematic for us, Judge, is that by going to his doctor and saying, I can't use vibrating tools at all. He took himself out of his employment without ever trying to show up. Well, aren't you assuming that a Barco mower is the equivalent of a vibrating tool? If you're going to make that, I mean, is that a fair statement? Well, so opposing counsel likes to make out that the Barco mower is a vibrating tool. I would argue based on my experience in the Barco mower that it is not. I actually went to the job site to photograph this thing for trial. And I mean, it runs pretty smoothly. Like I said, it's a massive, massive, massive piece of equipment that's all hydraulically operated. Well, let's stop one more time there. And I'm assuming this is what was put into evidence was the film of the Barco device operating on a cleared field. Correct. Now, I know that your opponent, Mr. Morrison, said that he doesn't, as a lawyer, have grip chainsaws and mowers. But if you've ever operated a brush hog or a large mower, if you get into heavy brush, it operates, it feels different than if you're in a cleared field. So if he's going through and knocking down, you know, two inch saplings, it's gonna, I've never seen a Barco mower that I'm aware of. Maybe I have, but don't know it. But I would assume that it would make some movement if it hit a large object as opposed to a cleared field. Well, and this is why we put in so many pictures and the video, honestly, is that, you know, this machine is humongous. It's not your everyday garden mower. And we asked his treating physician about this type of machinery, you know, the kind that operates on hydraulic controls, the kind that weighs 10 tons, you know, the kind of machinery that this is that hits huge obstacles and does not vibrate the same way that you would expect of, say, a commercial, you know, something you find at the Home Depot. Before presiding Justice Holder points out that the red light has come on, let me just make one last question. You just said, you know, a 10 ton machine. Is that just, you know, just kind of a number that you threw out? Or is this actually a 20,000 pound mower? I don't know the exact weight, Judge, but I would not be surprised if it was close to 10 tons. It is a massive, massive, massive piece of machinery. I'm going to look it up at some point, not in deciding this case, but later on, I want to see what this looks like. Any other questions from the court? Hearing none, I want to thank you both, counsel, for your arguments in this matter this afternoon.